Benjamin N. Gluck - SBN 203997
   bgluck@birdmarella.com
Paul S. Chan - SBN 183406
   pchan@birdmarella.com
Julia B. Cherlow - SBN. 290538
   jcherlow@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendants TruConnect
Communications, Inc., Matthew Johnson
and Nathan Johnson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| United States of America and the State of California ex rel. Regie Salgado and Melinda Zambrano,<br><br>              Plaintiffs and Relators,<br><br>     vs.<br><br>TruConnect Communications, Inc., Matthew Johnson and Nathan Johnson.<br><br>              Defendants. | CASE NO. 2:16-cv-03767-PSG-FFM<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS RELATORS' THIRD AMENDED COMPLAINT**<br><br>*Filed Concurrently with Declaration of Julia Cherlow; [Proposed] Order; and Request for Judicial Notice*<br><br>Date:     March 15, 2021<br>Time:     1:30 p.m.<br>Crtrm.:  6A<br><br>Assigned to Hon. Philip S. Gutierrez<br>Ctrm.: 6A |

3694776.2

1

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD, PLEASE**

2    **TAKE NOTICE** that, on March 15, 2021, at 1:30 p.m., or as soon thereafter as the

3    Court is available, in Courtroom 6A of the First Street Courthouse located at 350

4    West First Street, Los Angeles, California, 90012-4565, Defendants TruConnect

5    Communications, Inc., Matthew Johnson and Nathan Johnson ("Defendants") will

6    and hereby do move the Court to dismiss Relators Regie Salgado's and Melinda

7    Zambrano's ("Relators") Third Amended Complaint ("TAC") pursuant to Federal

8    Rule of Civil Procedure 12(b)(6), for failure to state a claim.

9        As detailed in the attached Memorandum of Points and Authorities, the

10   Relators' TAC still fails to state a claim under the federal or California False Claims

11   Act ("FCA") because: (1) it fails to plead with particularity that TruConnect violated

12   any requirements associated with its participation in the Lifeline Program; (2) it does

13   not link any such alleged violations to a false claim for payment or a false

14   certification of compliance that is a prerequisite for payment; and (3) given the

15   federal government's prior knowledge of the facts underlying Relators' claims and its

16   continued and uninterrupted payments of TruConnect's subsequent claims for

17   payment, Relators cannot establish that TruConnect **_knowingly_** presented a false

18   claim or that any alleged violation was **_material_** to payment of claims for federal

19   reimbursement.  Relators' retaliation claims and claims under the California labor

20   code are similarly flawed and must be dismissed.  Accordingly, TruConnect

21   respectfully requests that that all of Relators' claims be dismissed with prejudice.

22       TruConnect's Motion to Dismiss is based on this Notice, the attached

23   Memorandum of Points and Authorities, the concurrently-filed Declaration of Julia

24   B. Cherlow, the concurrently filed Request for Judicial Notice, the concurrently-filed

25   proposed order, any additional briefing on this subject, and the evidence and

26   arguments that will be presented to the Court at the hearing on this matter.

27       This motion is made following the conference of counsel pursuant to Local

28   Rule 7-3, which took place on January 26, 2021.  Relators oppose the motion.

1

DATED:  February 2, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Benjamin N. Gluck
Paul S. Chan
Julia B. Cherlow
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By: _____ /s/ Paul S. Chan _____
            Paul S. Chan
Attorneys for Defendants TruConnect
Communications, Inc., Matthew Johnson
and Nathan Johnson

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................... 9

II.     BACKGROUND ....................................................................................... 10

    A.  The December 2015 FCC Investigation ............................................. 10

    B.  Relators' Allegations and the Government's Decision Not to Intervene ............................................................................................... 11

    C.  The TAC Mischaracterizes The Relevant Lifeline Regulations ........... 13

II.     LEGAL STANDARDS .............................................................................. 15

    A.  Rule 12(b)(6) ...................................................................................... 15

    B.  Rule 9(b) ............................................................................................. 16

III.    ARGUMENT .......................................................................................... 17

    A.  Relators' First Two Causes of Action Under the FCA Should Be Dismissed Pursuant to Rule 12(b)(6) and for Failure to Meet Rule 9(b)'s Heightened Pleading Requirements .................................... 17

        1.  Relators Do Not Allege With Particularity that TruConnect Violated Any Lifeline Regulations ........................ 18

            a.  Relators' Allegations Regarding the "Street Teams" Do Not Cure the Deficiencies Identified by the Court. ............................................................. 18

            b.  Relators' New Allegations About the Purported Robo-Calls And Text Messages Are Insufficient. .......... 21

            c.  The TAC, Once Again, Relies on Relators' "Usage Analysis" that The Court Already Found To Be Insufficient to Infer a FCA Violation. ............................... 23

        2.  Relators Still Do Not Allege With Particularity Any False Statement in Connection with Any Claim for Payment. ........... 26

        3.  Relators Cannot Plead that TruConnect *Knowingly* Presented False Claims for Payment Given the Government's Undisputed Prior Knowledge and Continued Payments. .................................................................. 27

        4.  Relators Once Again Have Not, And Cannot, Plausibly Plead that Any Allegedly False Statement or Record Was *Material* to the Submission of a Claim for Payment. ................. 29

    B.  Nothing in the TAC Cures the Defects this Court Already Found in Relators' Retaliation Claim. .......................................................... 30

C.   Relators' State Law Claims Must Be Dismissed. .................................. 32

    3.   Relators' California FCA Claims (Counts 3, 4 and 6) Still Fail Under Rule 9(b). .................................................................. 32

    4.   Dismissal of Relators' FCA Claims Still Requires Dismissal of All State Law Claims .............................................. 33

D.   Leave to Amend Relators' Fourth Pleading Should Be Denied. .......... 33

IV.   CONCLUSION ............................................................................................ 34

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................. 16, 28

6
7

*U.S. ex rel. Becker v. Westinghouse Savannah River Co.*,
    305 F.3d 284 (4th Cir. 2002) ......................................................... 29

8
9

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................... 16, 28, 32

10
11

*Branch v. Tunnell*,
    14 F.3d 449 (9th Cir. 1994), *overruled on other grounds by*
    *Galbraith v. City of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) ...................... 16

12
13
14

*Brown v. Carrington Mortg. Servs., LLC*,
    No. 12-6974-PA-MRW, 2013 WL 1196868 (C.D. Cal. Mar. 25,
    2013) ............................................................................... 33

15
16

*U.S. ex rel. Cafasso v. Gen Dynamics C4 Sys.*,
    637 F.3d 1047 (9th Cir. 2011) ................................................ *passim*

17

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ......................................................... 28

18
19

*Ecological Rights Found. v. Pac. Gas & Elec. Co.*,
    713 F.3d 502 (9th Cir. 2013) ......................................................... 16

20
21

*U.S. ex rel. Hooper v. Lockheed Martin Corp.*,
    688 F.3d 1037 (9th Cir. 2012) ................................................. 17, 28

22
23

*U.S. ex rel. Hopper v. Anton*,
    91 F.3d 1261 (9th Cir. 1996) ......................................................... 31

24
25

*U.S. ex rel. Hunt v. Cochise Consultancy, Inc.*,
    887 F.3d 1081 (11th Cir. 2018) ....................................................... 28

26
27

*Klein v. Mony Life Ins. Co. of Am.*,
    No. CV 17-07003-RSWL-AS, 2018 WL 2472916 (C.D. Cal. May
    30, 2018) ........................................................................... 16

28

6

*Knudsen v. Spring Comms. Co.*,
    Nos. C13-04476 CRB, C13-4465 CRB, C13-4542 CRB, 2016 WL
    4548924 (N.D. Cal. Sept. 1, 2016)..................................................................30

*Lee v. City of L.A.*,
    250 F.3d 668 (9th Cir. 2001) ..........................................................................16

*Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*,
    275 F.3d 838 (9th Cir. 2002) ..........................................................................31

*Mullis v. U.S. Bankr. Court*,
    828 F.2d 1385 (9th Cir. 1987) ........................................................................16

*Sanford v. MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) ..........................................................................33

*Ebeid ex rel. U.S. v. Lungwitz*,
    616 F.3d 993 (9th Cir. 2010) .............................................................17, 18, 27

*United Health Servs., Inc. v. U.S. ex rel. Escobar*,
    136 S.Ct. 1989 (2016) ......................................................................17, 29, 30

*United Mine Workers v. Gibbs*,
    383 U.S. 715 (1966) .......................................................................................33

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003)........................................................................32

*U.S. ex rel. Zemplenyi v. Grp. Health Co-op.*,
    No. 09-603-RSM, 2012 WL 1642213 (W.D. Wash. May 10, 2012).................31

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..........................................................................33

**Statutes**

31 U.S.C. § 3729(a)(1)(A) .....................................................................................17

31 U.S.C. § 3729(a)(1)(B) .....................................................................................17

**Other Authorities**

47 C.F.R. 54.405(e)(3)..............................................................................15, 24, 26

47 C.F.R. § 54.404(a) ..............................................................................13, 14, 19

47 C.F.R. § 54.404(b) and (c) .................................................................................. 14

47 C.F.R. § 54.405(e)(3) ........................................................................................... 15

47 C.F.R. § 54.407(c)(2) ........................................................................................... 15

47 C.F.R. § 54.410 .................................................................................................... 14

47 C.F.R. § 54.410(a) and (b) ................................................................................... 14

47 C.F.R. §§ 54.410(b)(2)(i)-(ii), (c)(2)(i)-(ii) ........................................................ 15

47 C.F.R. §§ 54.410(b)(2), (c)(2) ...................................................................... 15, 19

47 C.F.R §§ 54.410(b) ............................................................................................... 18

Rule 8 ................................................................................................................... 18, 34

Rule 8(a) .................................................................................................................... 33

Rule 8(a)(2) ................................................................................................................ 15

Rule 9(b) ............................................................................................................ *passim*

Rule 12(b)(6) ................................................................................................. 15, 16, 17, 34

MOTION TO DISMISS THIRD AMENDED COMPLAINT

# I.      INTRODUCTION

It is time to end the four years of abusive litigation spawned by Relators' Regie Salgado and Melinda Zambrano ("Relators") meritless and opportunistic claims against TruConnect Communications, Inc., Matthew Johnson and Nathan Johnson (collectively, "TruConnect").  Relators drummed up this parasitic FCA lawsuit after a company-wide reduction-in-force eliminated their positions, and after working for TruConnect for all of four months.  (Third Amended Complaint ("TAC") ¶¶ 20-22, 156.)  Unhappy with their lay-off, Relators allege the company committed thus-far unspecified regulatory violations while procuring government reimbursement payments.  But even after further amendment, there is still absolutely no factual basis for Relators' false and inflammatory claims, each of which the Court already dismissed in its entirely.  (Dkt. No. 78 (the "MTD Order").)

The latest version of Relators' complaint—the ***fourth*** in this action—merely rehashes (in more paragraphs) the same allegations this Court already dismissed, based on the same alleged conduct that was disclosed to, and investigated by, the FCC, beginning one year ***before*** Relators filed this suit.  TruConnect fully cooperated with that investigation, and at its conclusion (and after tremendous cost to TruConnect), both the federal government and the People of the State of California declined to intervene in Relators' FCA action; as this Court noted, "the government knew about the allegations when Relators initiated this action in 2016, but chose not to intervene after conducting a two-year investigation."  (Dkt. No. 78 at 13.)  Not surprisingly, the TAC still does not allege that the "government stopped making payments to TruConnect or sought reimbursement from TruConnect for past payments during or after the two-year investigation," allegations this Court found absent from Relators' Second Amended Complaint (the "SAC").  (*Id*.)  Indeed, the government has never stopped payment on TruConnect's claims for payment, sought any restitution for prior payments, or otherwise taken issue with TruConnect's alleged conduct—and has continued to make payments year over year.  The continued absence of any allegation that the government changed its payment practices—notwithstanding the government's undisputed knowledge of

9

1  TruConnect's alleged conduct—is fatal to Relators' lawsuit.

2      After further amendment—and express pleading instructions from this Court—the

3  TAC *still* fails to state any legally-cognizable FCA claims.  **First**, the TAC still fails to

4  plead with particularity that TruConnect violated any Lifeline customer acquisition

5  requirements or Lifeline usage requirements.  **Second**, even if the TAC did adequately

6  plead any violations of Lifeline regulations, the TAC still does not link any such violations

7  to a single false claim for payment or a single false certification of compliance that is a

8  prerequisite for payment.  And **third**, given the federal government's undisputed

9  knowledge of the facts underlying Relators' claims and its continued payments of

10 TruConnect's claims, Relators still cannot prove that TruConnect *knowingly* presented a

11 false claim or that any alleged violation was *material* to payment of claims for federal

12 reimbursement.  Relators' retaliation claims and California FCA claims are similarly

13 flawed and similarly must be dismissed.

14     Plaintiffs suing under the FCA are held to heightened pleading and substantive

15 requirements because the Act is punitive in nature, and defending against even non-

16 intervened FCA actions imposes significant business disruption and financial burdens.

17 Relators have already made four unsuccessful attempts to meet these heightened pleading

18 and substantive requirements.  The TAC still falls woefully short.  Because Relators *still*

19 have not been able to cure the many deficiencies in their claims, there is no basis for a fifth

20 bite at the apple; the TAC should be dismissed with prejudice.

21 **II.    BACKGROUND**

22     **A.    The December 2015 FCC Investigation**

23     In or about December 17, 2015, the Office of the Inspector General of the FCC (the

24 "OIG") issued a subpoena to TruConnect (the "2015 Subpoena").  (RJN at Exh. 1.)  The

25 2015 Subpoena covers, among other things: (1) information relating to TruConnect's

26 participation in the Lifeline Program, generally (*id.* at Reqs. 5, 6, 12, 13); (2)

27 TruConnect's use of street teams to procure Lifeline subscribers, and their practices (*id.* at

28 Reqs. 1-3, 8, 9, 10, 12); (3) TruConnect's subscriber's usage/failure to use Lifeline

wireless services (*id*. at Req. 5); (4) TruConnect's submission of claims for payment for Lifeline subscribers (*id.* at Req. 7); and (5) any fraud, or investigation of fraud, in connection with TruConnect's participation in the Lifeline Program (*id.* at Reqs. 9-12). TruConnect made five productions to the OIG in response to each of the requests in the 2015 Subpoena, between February 1, 2016 and May 2, 2016.  (RJN at Exhs. 2-6.)

**B.**     **Relators' Allegations and the Government's Decision Not to Intervene**

Relators allege that they worked for TruConnect for approximately 3-4 months in the Spring of 2015.  (TAC ¶¶ 20-22.)  On May 31, 2016, Relators filed their first Complaint under seal.  (Dkt. No. 1.)  On September 19, 2016, the OIG issued a second subpoena to TruConnect (the "2016 Subpoena"), largely duplicative of the 2015 Subpoena, and seeking information from TruConnect regarding its user acquisition practices and subscriber usage data.  (RJN at Exh. 7.)  During the period from October 2016 through the end of 2017, TruConnect made multiple productions of documents and information in response to the 2016 Subpoena.  (RJN at Exhs. 8-13.)  After completing an exhaustive review of TruConnect's responses to the 2016 Subpoena, on October 8, 2019, the United States declined to intervene in Relators' case.  (Dkt. No. 54.)  On May 19, 2020, the People of the State of California also declined to intervene in Relators' case, and the case was unsealed.  (Dkt. Nos. 58, 59.)  On June 25, 2020, Relators filed the SAC.  (Dkt. No. 60.)  The Court dismissed the SAC in its entirety on November 23, 2020, but it granted Relators leave to amend.  (Dkt. No. 78).  Relators filed the TAC on January 4, 2021.  (Dkt. No. 79).

Relators' TAC substantially repeats the same allegations in the SAC that were already dismissed, concerning TruConnect's participation in the Lifeline Program.[1]

---

[1]    It bears mentioning that TruConnect's predecessor, Telscape Communications, was the first ETC approved to provide Lifeline wireless services in California, on March 14, 2014.  CPUC Approves First California Lifeline Wireless Telephone Service Plans (March, 11, 2014), https://docs.cpuc.ca.gov/PublishedDocs/Published/ G000/M088/K968/88968234.PDF (last visited Feb. 1, 2021).  This is a testament to TruConnect's outstanding audit history.

Specifically, Relators allege that TruConnect submitted false certifications of compliance with certain Lifeline regulations and submitted false claims for payment for wireless devices that did not meet Lifeline usage requirements, in violation of the federal and California FCA.

Relators, once again, offer two speculative theories to support their hypothesis of "falsity."[2]  First, Relators allege that TruConnect's use of street teams to obtain subscribers—a practice widely utilized by wireless carriers during the relevant period—somehow constituted "procur[ing] Lifeline subscriber[s] through improper means," and that the street teams do not obtain "proper certification" of Lifeline subscribers.  (TAC ¶¶ 63-68.)  Relators' new allegations with respect to the street teams (*id*. ¶¶ 98-113) are largely incomprehensible and are contradicted by the regulatory framework in place for Lifeline customer approvals in California (discussed below at Section II.C), which requires the California Lifeline Administrator to obtain "proper certifications" for Lifeline subscribers, ***not carriers like TruConnect***.  While Relators inaccurately (and confusingly) reference a number of Lifeline regulations in the TAC (*id*. at ¶¶ 34-49), Relators do not allege that the street team practices, in themselves, violate any of these specific regulations, and in fact, they do not.

Second, Relators continue to allege that TruConnect pumped "robo-calls" and text messages to show fraudulent usage on its Lifeline wireless accounts, and that TruConnect allegedly counted these contacts as "usage," and billed the government for these accounts, in violation of Lifeline regulations.  (*Id*. at ¶¶ 8, 13, 68, 95, 99.)  Relators' allegations are still based on approximately one month of purported "subscriber data," which this Court already found to be insufficient to support an inference of fraud.  (Dkt. No. 78 at 9-11.)

_____

[2]   Relators also allege that "Defendants Refuse to Deny the Allegations."  (TAC ¶ 174.) Relators fail to mention that they served their Requests for Admission on November 25, 2020, two days ***after*** the Court dismissed all of the claims in Relators' operative complaint, and Relators had no claims pending.  (Dkt. No. 78.)  TruConnect objected to the discovery requests on that basis; it did not admit the allegations.

And they still fail to identify **even one** specific robo-call or text message, much less that any person/entity related to TruConnect caused the robo-calls or texts to be sent, or that TruConnect actually submitted any claims for payment based solely on usage generated by any of these alleged robo-calls or texts.  (*Id*. at ¶¶ 75-86, 116-122, 130, 142.)  Relators' "Additional Facts Regarding Usage Fraud," (TAC at ¶¶ 114-150) fare no better—Relators allege simply that (1) TruConnect purportedly **discussed** the development of an "Auto-Dialer App," (which Relators never allege was actually developed or installed in any TruConnect Lifeline wireless devices), and (2) that TruConnect knew that some of its telephone numbers for the Lifeline Program were recycled (but Relators do not allege that TruConnect actually recycled the numbers), neither of which is alleged to violate any Lifeline regulations.  (*Id*. at ¶¶ 124-29, 132-34.)  More fatally, Relators never allege that TruConnect actually billed the government for any devices that would have had insufficient usage **but for** (1) calls made by this "Auto-Dialer App" that was never developed or installed, or (2) because of calls made due to the recycling of telephone numbers (which Relators do not allege is caused by TruConnect, and which is not a violation of the Lifeline regulations).  Having stated these two speculative theories, Relators then conclude that false claims for payment were therefore submitted to the government, in violation of the federal and California's FCA.  (*Id*. at ¶¶ 95-97, 110-12, 143-44.)

Finally, Relators conclusorily allege that when they presented their "concerns" about "unusual usage" to TruConnect, they were terminated, in violation of the retaliation provisions of the federal and California FCA and the California Labor Code.  (*Id*. at ¶¶ 153, 156.)  Relators, however, admit that TruConnect was conducting a reduction in force at the exact time they were terminated.  (*Id.* ¶ 156.)

## C.     The TAC Mischaracterizes The Relevant Lifeline Regulations

The TAC purports to cite certain Lifeline regulations, but it does so inaccurately and misleadingly.  First, Relators allege incorrectly that, "under 47 C.F.R. § 54.404(a) the Lifeline program requires TruConnect to be state certified." (TAC ¶ 39).  47 C.F.R. §

1  54.404(a), entitled "State Certification," actually discusses the type of certifications that a

2  *state* (not an eligible telecommunications carrier or "ETC", like TruConnect) must obtain

3  in order to administer Lifeline subscriber certifications and approvals.  A valid state

4  certification "must include a statement that the state has a comprehensive system in place

5  to prevent duplicative federal Lifeline support," and must "also describe in detail how the

6  state system functions and for each requirement adopted by the Commission to prevent

7  duplicative support, how the state system performs the equivalent functions."  *Id*.

8  California obtained a valid state certification, and California Public Utility Commission

9  has been administering the Lifeline Program through a third party administrator since

10 before 2012.  *See generally* Resolution T-17366 - Modifications to the California Lifeline

11 Program Rules - Gen. Order 153 - in Compliance with the Fed. Commc'ns Commissions

12 Lifeline/link-Up Reform Order (FCC 12-11), No. ID174370, 2012 WL 2945692 (July 12,

13 2012).

14      There is nothing in the plain language 47 C.F.R. 54.404(a) that addresses "state

15 certifications for ETCs."  Instead, 47 C.F.R. § 54.404(a) makes clear that "[a]n eligible

16 telecommunications carrier [like TruConnect] operating in a state that provides an

17 approved valid certification to the Commission in accordance with this section [like

18 California] *is not required to comply with the requirements set forth in paragraphs (b)*

19 *and (c) of this section with respect to the eligible telecommunications carriers'*

20 *subscribers in that state*."  *Id*. (emphasis added).  Paragraphs (b) and (c) of 47 C.F.R. §

21 54.404 provide certain requirements for ETCs operating in states that, unlike California,

22 do not have a valid FCC certification.

23      Relators similarly mischaracterize 47 C.F.R. § 54.410, which addresses

24 requirements for eligibility determination and certification.  Relators allege that, "[u]nder

25 47 C.F.R. § 54.410(a) and (b) carriers like TruConnect must certify subscribers are

26 eligible to participate in the Lifeline program.  Carriers must confirm subscribers meet

27 the low income requirements and complete enrollment steps and certification."  (TAC ¶

28 34.)  This is contradicted by the plain language of the statute, which provides that in

states like California, the "***state Lifeline administrator, or other state agency is***
***responsible for the initial determination of a subscriber's eligibility***[.]"  47 C.F.R. §§
54.410(b)(2), (c)(2) (emphasis added).  ETCs, like TruConnect, may claim
reimbursement when the state Lifeline administrator or other state agency provides
"[n]otice that the prospective subscriber meets the income eligibility criteria," and "a
copy of the subscriber's certification[.]"  47 C.F.R. §§ 54.410(b)(2)(i)-(ii), (c)(2)(i)-(ii).

      Relators also misrepresent 47 C.F.R. § 54.405(e)(3), which addresses de-
enrollment for Lifeline subscribers that do not meet the Lifeline usage requirements.  The
TAC alleges that, "[u]nder 47 C.F.R. § 54.405(e)(3) a carrier cannot collect the monthly
Lifeline fee if the Lifeline subscriber fails to meet 'usage' requirements set out in 47
C.F.R. § 54.407(c)(2)."  (TAC ¶ 44.)  That is not an accurate description of the
regulation.  47 C.F.R. 54.405(e)(3) provides: "if a Lifeline subscriber fails to use, as
'usage' is defined in § 54.407(c)(2), for 60 consecutive days a Lifeline service . . . an
eligible telecommunications carrier must provide the subscriber 30 days' notice, using
clear, easily understood language, that the subscriber's failure to use the Lifeline service
within the 30–day notice period will result in service termination for non-usage under this
paragraph.  If the subscriber uses the Lifeline service within 30 days of the carrier
providing such notice, the eligible telecommunications carrier shall not terminate the
subscriber's Lifeline service."  *Id*.  While this paragraph addresses the process for de-
enrollment of subscribers with insufficient usage, it says nothing about billing the
government for these subscribers.  Moreover, this section provides an additional 30 day
safe-harbor (on top of the 60 day usage period (TAC ¶ 43)) for subscribers with no usage,
before their Lifeline service is terminated.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(6)

      To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)
("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face'" in order to satisfy Rule 8(a)(2).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This plausibility analysis requires more than Relators' "legal conclusions and threadbare recitals of a cause of action."  *Iqbal*, 556 U.S. at 678.  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id*.  That is, "[f]actual allegations must be enough to raise a right of relief above the speculative level[.]"  *Twombly*, 550 U.S. at 555.  Dismissal is appropriate if the well-pleaded facts do not "possess enough heft" to warrant an inference of anything more than the mere possibility of misconduct.  *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 511 (9th Cir. 2013); *see Iqbal*, 556 U.S. at 678.

As a general rule, a court may not consider "any material beyond the pleadings" when ruling on a Rule 12(b)(6) motion.  *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).  However, "a court may take judicial notice of 'matters of public record,'" *id*. at 689 (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)), without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment.  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. City of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002).  As the Court already found, this includes the service of, and response to, subpoenas, especially when issued by an administrative agency like the FCC.  *See* Dkt. No. 78 at 4; *see also Klein v. Mony Life Ins. Co. of Am.*, No. CV 17-07003-RSWL-AS, 2018 WL 2472916, at *3 (C.D. Cal. May 30, 2018) ("Finally, the Court takes judicial notice of the fact of service of and response to the subpoena").  The court need not accept as true allegations that contradict facts which may be judicially noticed.  *See Mullis v. U.S. Bankr. Court*, 828 F.2d 1385, 1388 (9th Cir. 1987).

**B.   Rule 9(b)**

Because the FCA is a fraud statute, Relators' TAC is also subject to the pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").  *U.S. ex rel. Cafasso v. Gen Dynamics C4 Sys.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011).  While the Ninth

Circuit does not require Relators to identify each allegedly false claim for payment at issue, it does mandate that they allege "details of a scheme to submit false claims paired with ***reliable indicia*** that lead to a ***strong inference*** that claims were actually submitted." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010) (emphases added). The heightened pleading standard of Rule 9(b) therefore requires Relators to state with particularity the circumstances constituting the FCA violation, including the "'who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso,* 637 F.3d at 1055 (quoting *Ebeid*, 616 F.3d at 998). As discussed below, Relators still do not meet this rigorous standard.

## III.  ARGUMENT

### A.  Relators' First Two Causes of Action Under the FCA Should Be Dismissed Pursuant to Rule 12(b)(6) and for Failure to Meet Rule 9(b)'s Heightened Pleading Requirements.

The Supreme Court has made clear that the FCA is not an "all-purpose antifraud statute." *United Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989, 2003 (2016). Mere "unsavory conduct is not, without more, actionable under the FCA." *Cafasso*, 637 F.3d at 1058. Even with the benefit of every pleading inference, a complaint that merely "identifies a general sort of fraudulent conduct but specifies no particular circumstances of any discrete fraudulent statement, is precisely what Rule 9(b) aims to preclude." *Escobar*, 136 S.Ct. at 1057.

To state a cause of action under 31 U.S.C. § 3729(a)(1)(A), Relators must set forth well-pleaded facts demonstrating that TruConnect knowingly presented or caused to be presented a false or fraudulent claim for payment to the government. *U.S. ex rel. Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012). To state a cause of action under 31 U.S.C. § 3729(a)(1)(B), Relators must plead facts demonstrating that TruConnect knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim. *Id*. at 1048. Under both theories, Relators must plead with particularity facts demonstrating "(1) a false statement or fraudulent course of conduct, (2)

made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Ebeid*, 616 F.3d at 997.  Relators, once again, fail to meet multiple prongs of this standard under Rule 9(b) and Rule 8, as set out below.

### 1. Relators Do Not Allege With Particularity that TruConnect Violated Any Lifeline Regulations.

Relators once again try to allege that TruConnect violated certain Lifeline regulations by incorrectly, and incompletely, citing to the Lifeline regulations themselves, and detailing in confusing and conclusory terms Relators' purported "analysis" of TruConnect's usage and subscriber data.  When boiled down to their core, however, Relators' new allegations are based on the same conduct that the Court already found insufficient to successfully allege a FCA violation—namely, that TruConnect violated certain unspecified Lifeline regulations by (1) employing street teams to assist with customer acquisition (TAC ¶¶ 34-38, 63-68, 98-113), and (2) using alleged robo-calls and unsolicited text messages to falsify usage data for subscribers, and then billing the government for these accounts.  (*Id*. ¶¶ 8, 13, 68, 75, 90, 91, 95.)  Notwithstanding the MTD Order's clear guidance about the prior deficiencies in these allegations, Relators still fail to satisfy Rule 9(b) and Rule 8.

### a. Relators' Allegations Regarding the "Street Teams" Do Not Cure the Deficiencies Identified by the Court.

Relators' street team allegations at paragraphs 34-49 and 63-68 of the TAC repeat all of the street team allegations from paragraphs 34-49 and 63-70 of the SAC.[3]  This Court already found that these allegations were insufficient, holding:

> [these] allegations regarding street teams do not lead to a "strong inference" that false claims were submitted. Relators allege that TruConnect (1) hires street teams (2) to stand outside areas such as social security offices and (3) hand out pre-activated phones, and that this violates 47 C.F.R. § 54.410(a) and (b)[4] because the street teams do not collect the

---

[3]  The TAC contains fewer paragraphs than the SAC because paragraphs 67-68 and 69-70 were combined in the new pleading.

[4]  Relators previously led the Court to error with respect to their description of 47 C.F.R

1   requisite information to ensure their subscribers are eligible for
    Lifeline. *See id*. ¶¶ 34–38, 63–66.  Furthermore, Relators allege
2   that "[t]he street teams . . . [d]o not verify certification under 47
    U.S.C. § 54.404(a)[5] [or] . . . investigate if there is more than
3   one [L]ifeline subscriber per household." *Id*. ¶ 66.

4   However, Relators do not connect this behavior to any false
    claims. In particular, there are no allegations that these specific
5   phones are deemed "active" and then billed to the government.
    Without such allegations, Relators have failed to meet Rule
6   9(b)'s heightened pleading standards regarding the street teams.

7   (Dkt. No. 78 at 10.)

8        Relators' new street team allegations (TAC ¶¶ 98-113) are unclear and ineffectual,

9   and do nothing to cure the glaring pleading defects identified by the Court.  They certainly

10  do not come close to showing the "who, what, when, where, and how of the misconduct

11  charged," as required under Rule 9(b).  *Cafasso,* 637 F.3d at 1055.

12       First, Relators allege that "sim cards that make Lifeline phones work were delivered

13  active to street teams," that "street teams were incentivized by compensation to deliver

14  phones regardless of whether the customer was eligible," and that "the FCC has since

15  prohibited this practice."  (TAC ¶¶ 98-100.)  But Relators do not allege that this practice

16  was prohibited at the time or otherwise violated any Lifeline regulations.  To the contrary,

17  Relators concede this practice was "pursuant to standard practice and protocols."  (*Id*. ¶

18  98.)  Nor do Relators allege that TruConnect actually delivered active phones to ineligible

19  customers—they did not, and it would have been nearly impossible to do so given that the

20  California Lifeline Administrator, not TruConnect, is responsible "***for the initial***

21  ***determination of a subscriber's eligibility***."  47 C.F.R. §§ 54.410(b)(2), (c)(2) (emphasis

22  added).  And critically, Relators do not allege that TruConnect billed the government for

23  

24  §§ 54.410(b) and (b), which, as explained above in Section II.C, actually requires the
    state Lifeline administrator, not the ETC (like TruConnect), to make the initial eligibility
25  determinations.

26  
    [5]  Similarly, Relators misled the Court on the requirements of 47 C.F.R. § 54.404(a),
27  which describes the elements of a valid "State Certification," and does not address street
    team obligations to verify subscriber certifications.
28

1  any of these devices, much less active devices that were delivered to "ineligible
2  customers."

3      Next, Relators allege that "TruConnect did not have a system to confirm that the
4  phones were delivered to eligible customers," and that "TruConnect's billing system was
5  unable to determine whether a phone shown as active was in a qualifying customer's
6  hands." (TAC ¶¶ 101, 113.) But whether TruConnect's system had that capacity is
7  irrelevant—because in California, that function is outsourced to the California Lifeline
8  Administrator responsible for determining subscriber eligibility. Relators do not allege
9  that such a system is required (at the carrier level) by any Lifeline regulation, because it is
10 not.

11     Relators go on to make a number of other irrelevant allegations that have nothing to
12 do with violating Lifeline regulations or falsifying usage. First, Relators purport to quote
13 Nathan Johnson (defendant and co-CEO of TruConnect) and Rick Burgar (Vice President
14 of Revenue Assurance for TruConnect), stating, "'[L]et's get an 'end of month team' to
15 stuff through **orders** and they should be at the office until 11:59 pm on the last day of the
16 month'" and "'[W]e consider the **order** completed when the tracking number is in our
17 billing system with an entry date before midnight on the last day of the month." (TAC ¶¶
18 103, 104 (emphases added)). But Relators do not allege that these "orders" have anything
19 to do with Lifeline wireless phones (they do not), much less that these "orders" are (or
20 relate to) Lifeline wireless phones billed to the government that somehow violate certain
21 unspecified Lifeline regulations. Indeed, and more plausibly, the quoted discussion
22 actually concerns TruConnect's month-end accounting for its orders of wireless headsets
23 from providers like Ingram Micro, not its billings to the government, which are not
24 "orders."

25     Similarly, Relators allege that Lifeline phones remained active in TruConnect's
26 billing system when they were "in for repair." (*Id*. ¶¶ 106-09). Of course they did. If a
27 subscriber sent its phone "in for repair," presumably it wanted the repaired phone back, to
28 continue using the Lifeline wireless program. To deactivate and then reactivate each

3694776.2

20

1  device that came in for service would make no sense and cause substantial inefficiencies.

2  Relators do not allege that this conduct violated any regulation or was tied to any false

3  claim for payment on the government.  Similarly flawed is Relators' allegation that "when

4  TruConnect tried to send replacement phones, many were returned because of invalid

5  addresses or addressee not at address."  (*Id*. ¶ 110.)  Relators do not cite to even one

6  replacement phone that was returned, much less allege that any replacement phone that

7  was returned was billed to the government.

8          Finally, Relators make a number of conclusory statements about TruConnect's

9  billing practices, including that "TruConnect billed for subscribers before a subscriber had

10  possession of a phone," "Relators know that TruConnect's practice, procedure, and

11  protocols was [sic] that it billed the government for every phone its billing system showed

12  was active," and "Matthew and Nathan Johnson acknowledged and pressured this

13  fraudulent billing procedure for all active phones to be followed."  (*Id*. ¶¶ 102, 111-12.)

14  However, Relators do not provide any ***facts*** to support these (false) legal conclusions.

15  Relators still do not point to even one phone that was billed to the government either (1)

16  before it was in the hands of an eligible subscriber, or (2) because it was designated

17  "active" in TruConnect's billing system, but otherwise did not meet the Lifeline usage or

18  subscriber requirements.  Indeed, Relators concede they "do not have possession of actual

19  invoices."  (*Id*. ¶ 111.)  Without more, Relators' street team allegations, once again, do not

20  state with particularity "'what is false or misleading about [the purportedly fraudulent]

21  statement, and why it is false.'"  *Cafasso,* 637 F.3d at 1055.

22              **b.     Relators' New Allegations About the Purported Robo-Calls**
                 **And Text Messages Are Insufficient.**
23

24          Relators also repeat their allegations from the SAC that TruConnect violated certain

25  Lifeline usage requirements by "pushing" robo-calls and text messages to Lifeline

26  accounts that do not meet the Lifeline usage requirements.  (*See, e.g.*, SAC ¶¶ 8, 13, 70,

27  77, 88; TAC ¶¶ 8, 13, 68, 95, 99.)  This Court already found these allegations to be

28  insufficient, as well, explaining:

3694776.2

MOTION TO DISMISS THIRD AMENDED COMPLAINT

1
2
3
4
5

> But Relators fail to show that TruConnect, or any of its officers or employees, are somehow connected to these fraudulent text messages or robo-calls.  This is important because, under the Lifeline regulations, accepting a call from a party other than TruConnect or its representative is considered "usage." 47 C.F.R. § 54.407(c)(2); SAC ¶ 43.  Furthermore, even if Relators alleged that TruConnect or its representatives placed the robo-calls, Relators fail to allege that TruConnect billed the government for these phones.

6  (Dkt. No. 78 at 10.)

7      Relators' TAC attempts to address these deficiencies by alleging that TruConnect

8  was *discussing* the *development* of an "'Auto-Dialer App' Feature that would be

9  preloaded into each handset that TruConnect purchased from SMT."  (TAC ¶¶ 124-129.)

10  Relators go so far as to allege that they heard Matthew and Nathan Johnson "'low talking'

11  about how an app like this *would* allow TruConnect to meet the FCC's Lifeline outbound

12  call requirement."[6]  (TAC ¶ 127 (emphasis added).)  These speculative allegations are not

13  substitutes for facts.  The language Relators use makes clear that this purported "Auto-

14  Dialer App" was *just a concept*.  Relators never allege that the purported Auto-Dialer App

15  was *ever actually developed*, much less that it was ever *installed* in any wireless devices

16  purchased by TruConnect and then provided to Lifeline wireless subscribers.  Indeed, it

17  was not.

18      Moreover, Relators certainly do not allege that TruConnect billed the government

19  for any Lifeline wireless telephones that, *but for* usage generated by this yet-to-be

20  developed Auto-Dialer App, would not have met the Lifeline usage requirements.

21

22
23
24
25
26
27
28

---

[6]   Relators also purport to quote a statement from an email sent by Nathan Johnson stating, "'we need to make sure we are including this [Auto-Dialer App] in all the handsets we are distributing in [California] . . . . can we also get a software upgrade (over the air) to install in [existing] phones?'"  (TAC ¶ 129 (brackets inserted by Relators in the TAC quote).)  The brackets in the quote, however, make it impossible to tell what Mr. Johnson was actually writing about—the quoted language could be about any software upgrades.  Only the language added in brackets by Relators suggests that the quote has anything to do with the purported Auto-Dialer App or handsets distributed in California. Tellingly, Relators do not attach the email to the TAC.

1   Relators still do not identify even one specific robo-call or text message, or one phone

2   number from which such purported robo-calls/text messages were sent.  And Relators still

3   do not point to any TruConnect officer, employee, agent, or representative who actually

4   made, or caused to be made, even one robo-call or text message.  As before, Relators new

5   allegations cannot support Relators' falsity conclusion because Relators fail to plead the

6   "'who, what, when, where, and how of the misconduct charged.'"  *Cafasso,* 637 F.3d at

7   1055.

8               **c.      The TAC, Once Again, Relies on Relators' "Usage Analysis"**

9                        **that The Court Already Found To Be Insufficient to Infer a**
                         **FCA Violation.**

10          Relators repeat their usage allegations from the SAC (¶¶ 85-96) that were based on

11   a purported analysis of 38 days of "subscriber data."  (TAC at ¶¶ 79-92.)  The Court

12   already found this data-set was insufficient to support an inference of fraud, explaining

13   that:

14               Relators allege Salgado analyzed subscriber data over a 38-day
                 time span consisting of 369,081 total phone records, and that
15               13.67 percent of these subscribers show zero to one minute of
                 usage and no texting.  SAC ¶ 85.   This dataset is insufficient
16               for the Court to infer an FCA violation because Lifeline
                 requires a customer to use the service at least once every sixty
17               days.  *Id*. ¶ 7.  Thus, ***a dataset that only reflects a 38-day time***
                 ***span cannot lead to the conclusion that these phones were not***
18               ***used for the full 60-day period.***  Furthermore, Relators do not
                 allege that any of the phones from this dataset were not "used"
19               as required by the Lifeline regulations, because they all
                 allegedly had "zero to one minute" of usage and/or "text
20               messages." *Id*. ¶¶ 85–87.

21   (Dkt. No. 78 at 10-11 (emphasis added).)

22          Rather than alleging an alternative basis for their claims, Relators' new allegations

23   double down on this same data-set.  (TAC ¶¶ 115-122, 130-31.)  Relators provide some

24   additional "context," to explain why they obtained the subscriber data, which they

25   otherwise would not have had access to, given their job functions (neither of which relate

26   to TruConnect's billing for Lifeline wireless subscribers).  (TAC ¶ 119.)  But context

27   cannot get around the underlying problem with the data-set—that "a 38-day time span

28   cannot lead to the conclusion that these phones were not used for the full 60-day period."

3694776.2

23

1    (Dkt. No. 78 at 11.)  Especially so, given the additional 30-day usage safe-harbor provided

2    under 47 C.F.R. 54.405(e)(3), which extends the 60-day usage period to 90-days.

3         Relators' only "solution" to this fundamental problem is to allege that, "[i]n

4    Salgado's experience," the data he received was "an adequate sample to extrapolate

5    typical usage for these phones over a 60-day period."  (TAC ¶ 130).  Relators, however, do

6    not plead any **facts** indicating that Salgado's experience as Director of Inventory

7    Operations, responsible for managing the distribution of headsets, would provide him with

8    the requisite knowledge to make such conclusions about extrapolations from the 38-days

9    of subscriber usage data.  Indeed, Relators do not allege any **facts** indicating that Salgado

10   has **any** experience analyzing subscriber usage data at all, much less extrapolating usage

11   for Lifeline wireless devices.  Nor do Relators plead any **facts** supporting their allegation

12   that, "[b]ased on Salgado's experience, the data analyzed was an adequate sample size for

13   audit purposes to determine whether units with no usage were considered active."  (*Id.* ¶

14   142.)  These flaws are critical.  Relators' conclusion, ***based on Salgado's purported***

15   ***experience***, is the sole basis for alleging that, "TruConnect was billing the government for

16   all units shown to be active, even those without usage," and that as a result, "the

17   government was being billed for units that did not meet its usage requirements."[7]  (*Id.* ¶¶

18   143-44.)  But Relators have plead no **facts** justifying these multiple inferences and

19   conclusions.  And Relators still fail to identify even one Lifeline wireless device that was

20

21   [7]   The same goes for Relators' conclusory allegation that "Salgado's experience" was the

22   basis for identifying certain "red flags" in the usage patterns of the subscriber data.  (TAC

23   ¶ 122.)  Even more problematic for this allegation, the data-set as excerpted in the TAC
would not show the type of usage patterns Relators complain about, because it does not

24   provide information about individual calls/texts.  Even assuming that it did, given that

25   each of TruConnect's Lifeline wireless subscribers comes online at different times, a snap-
shot of 38-days of data would not provide insight into usage "within the first several

26   weeks" for any meaningful number of TruConnect's Lifeline customers.  It's entirely

27   implausible that even a minority of the 369,081 records "analyzed" came online during
this random 38-day period.

28

billed to the government because it was considered "active" by TruConnect, but that actually had no usage, or had usage that did not comply with the Lifeline regulations. These types of threadbare assertions, without more, simply do not provide the "'who, what, when, where, and how of the misconduct charged,'" as required under Rule 9(b).

Even assuming the 38-day sample were adequate for extrapolation, the analysis still does not identify any subscribers with zero minutes of usage or who otherwise ran afoul of the Lifeline usage requirements.[8]  Indeed, the chart Relators include as "evidence" of their analysis (TAC ¶ 84), shows that *each subscriber had at least one minute of usage* (*id.*), and many had one or more SMS messages.  (*Id.*)  By Relators' own account of the Lifeline usage requirements (*id.* ¶ 43), this is sufficient for TruConnect to bill the government.

Relators' remaining usage allegations—(1) usage was discussed on weekly staff calls (*id*. ¶¶ 123, 148), (2) TruConnect knew that some of its telephone numbers were recycled, a standard practice in the industry (and one performed by telephone service providers, not ETCs)[9] (*id.* ¶¶ 132-34), (3) TruConnect's billing system was based on a

---

[8]   And even if the 38-day analysis *did* show certain usage violations (it does not), and even if Relators actually alleged that TruConnect submitted claims for payment for subscribers who violated the Lifeline usage requirements (they do not), Relators' allegations would fail for a separate and independent reason: TruConnect, like all other participants in the Lifeline wireless program, can amend its claims for payment after filing up to a year, if any errors may have been made.  Every carrier does this as a part of its normal operating procedure.  For Relators' claims based on the purported 38-day analysis to succeed, they would need to meet this additional hurdle of alleging that TruConnect never submitted amended claims for payment.  But Relators do not, and cannot, make this allegation.

[9]   There is no merit to (or fact supporting) Relators' conclusory allegation that, "[t]hese phones were considered active even though usage was a result of recycled numbers and all active phone usage was billed to the government.  TruConnect billed all subscribers it considered active that may be receiving these recycled phone calls. As always, TruConnect considered the phones active even though their usage was likely not real usage."  (TAC ¶ 134.)  Again, Relators do not allege that TruConnect caused the numbers to be recycled—it did not because ETCs, like TruConnect, do not control the recycling of telephone numbers.  Nor do Relators identify any TruConnect phones that received

legacy landline system that did not have an "automatic disconnect" process[10] (*id.* ¶¶ 145-46), and (4) the Johnsons were involved with the acquisition of Sage Telecom (*id.* ¶ 147)—are similarly deficient because Relators do not allege any of these actions, in themselves, violate Lifeline usage requirements.  Much less do Relators connect any of these actions with even one Lifeline wireless device that was billed to the government with insufficient usage.  Once again, Relators' usage allegations fail to meet the heightened pleading requirements of Rule 9(b) and should be dismissed with prejudice.

### 2. Relators Still Do Not Allege With Particularity Any False Statement in Connection with Any Claim for Payment.

The Court previously found that:

> the closest Relators come to successfully alleging an FCA violation is the allegation that "Salgado analyzed [current and historical usage data] and discovered that of 60,000 Lifeline subscribers, 8,800 showed no calls or text messages for over a year but were still identified by TruConnect as 'active.' If TruConnect considers a phone 'active,' it will bill the government for that phone." SAC ¶¶ 82–83. However, these allegations are insufficient to allege FCA violations because it is unclear whether this usage data was in fact used to submit claims to the government. See U.S. ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002) ("Without the presentment of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act.").

(Dkt. No. 78 at 11.)

Tacitly admitting that they are unable to plead facts supporting this allegation,

---

recycled numbers, much less one phone that ***but for*** having a recycled number, would not have met the Lifeline usage requirements.  They certainly do not point to any phones TruConnect actually billed to the government based on "not real usage," due to having a recycled phone number.

[10]  This allegation makes no sense.  Whether the billing system could "automatically disconnect," has no bearing on whether TruConnect billed the government for Lifeline wireless subscribers with insufficient usage.  And 47 C.F.R. 54.405(e)(3), which governs "de-enrollment," provides for an individualized outreach process after 60 days of non-usage, including a 30-day safe-harbor period.  This hardly requires an "automatic disconnect" process.

***Relators have now deleted this allegation from their TAC***.  What's left are two wholly conclusory statements, that (1) "TruConnect makes false statements for payment to the government about its compliance with the Lifeline regulations" (TAC ¶ 88); and (2) "[w]hen TruConnect submits invoices to FCC, including FCC form 497, every month, it submits false claims for payment because the subscribers TruConnect claims are not ***legitimate subscribers*** under Lifeline regulations." (*Id.* ¶ 87 (emphasis added)).  No facts are pled to support these conclusions.  Neither conclusory statement is sufficient to provide the "who, what, where, when, why and how" required to show TruConnect made false statements in connection with a claim for payment, or to prevail on a false certification theory.  *Cafasso,* 637 F.3d at 1055.

Relators still do not allege even one false statement TruConnect made with respect to its compliance with Lifeline regulations.  Much less do they allege how any of TruConnect's subscribers were not "legitimate," or that even one FCC Form 497 submitted by TruConnect—or any specific subscribers included in, or related to, a FCC Form 497 submission—actually violated any Lifeline requirements (and remained uncorrected after TruConnect submitted any amendments thereto), or any connection between any FCC Form 497 and any claim for payment.  Again, this simply is not enough to show the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998.

### 3. Relators Cannot Plead that TruConnect *Knowingly* Presented False Claims for Payment Given the Government's Undisputed Prior Knowledge and Continued Payments.

Relators' current allegations with respect to TruConnect's "knowledge" also repeat the same allegations this Court already found to be deficient.[11]  (SAC ¶¶ 13, 110, 122;

---

[11]  The Court dismissed Relators' FCA Claims in the SAC on the ground they failed to allege with particularity that TruConnect violated any Lifeline regulations or made false statements in connection with a claim for payment, it also addressed certain arguments with respect to "knowledge" and "materiality." (Dkt. No. 78 at 11-13.)

1  TAC ¶¶ 13, 176, 188.)  The Court explained:

2  
> Relators' SAC falls short of alleging the requisite knowledge
> under the FCA.  Relators argue that they "specifically allege
> that Defendants knowingly submitted numerous fraudulent
> usage minutes in billing the government to collect false
> payment for defunct phones." MTD Opp. 6:12–14 (citing SAC
> ¶¶ 13, 110, 118, 122, 126, 131, 139, 143, 147).  But it is not
> enough to allege that Defendants knew they submitted usage
> data. Relators must plausibly allege that Defendants knew of
> the data's falsity. Conclusory allegations that Defendants
> "knew" or "acted in reckless disregard of the truth" are
> insufficient to allege knowledge under the plausibility standard
> set out in *Iqbal* and *Twombly*.

9  (Dkt. No. 78 at 12 (citation omitted).)

10      Relators' new "knowledge" allegations are just as conclusory.  Relators allege that
11  TruConnect knew its claims were false because: (1) certain replacement phones were
12  returned because of invalid addresses (TAC ¶ 110); and (2) TruConnect knew it used
13  recycled telephone numbers that were recycled "too quickly."  (*Id.* ¶ 132.)  On these
14  bases alone, Relators allege, "TruConnect and its management knew about the false
15  billing," (*id.* ¶ 135), even though Relators do not cite even one replacement phone that
16  was returned, one telephone number that was recycled "too quickly" (which TruConnect
17  could not have caused), much less do they allege these practices violate Lifeline
18  regulations (they don't) or that TruConnect actually billed the government for any of
19  these phones.  The plausibility standard set out in *Iqbal* and *Twombly* requires more than,
20  as here, Relators' "legal conclusions and threadbare recitals of a cause of action."
21  *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998 (9th Cir.
22  2014) (quotation and citation omitted).

23      Furthermore, when, as here, the government continues to authorize payment on
24  allegedly "false claims" with knowledge of the facts underlying the alleged falsity, there is
25  an inference that the defendant has ***not*** knowingly presented a false claim because it
26  understood the conduct to be lawful.  *U.S. ex rel. Hunt v. Cochise Consultancy, Inc.,* 887
27  F.3d 1081, 1093 n.10 (11th Cir. 2018); *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037,
28  1051 (9th Cir. 2012) ("government knowledge may show that the defendant did not

1    'knowingly' submit a false claim and so did not have the intent required by the ... FCA."

2    (internal quotation marks omitted)); *U.S. ex rel. Becker v. Westinghouse Savannah River*

3    *Co.*, 305 F.3d 284, 289 (4th Cir. 2002) ("[T]he government's knowledge of the facts

4    underlying an allegedly false record or statement can negate the scienter required for an

5    FCA violation.").  Relators do nothing to rebut this inference.  Given the government's

6    undisputed prior knowledge of the conduct alleged and its unchanged payment practices,

7    Relators cannot plausibly allege "knowledge."

8              **4.     Relators Once Again Have Not, And Cannot, Plausibly Plead that**

9                      **Any Allegedly False Statement or Record Was *Material* to the**
                       **Submission of a Claim for Payment.**

10         As this Court clearly explained:

11              A misrepresentation about compliance with a statutory,
               regulatory, or contractual requirement must be material to the
12              Government's payment decision in order to be actionable under
               the False Claims Act." *Universal Health Servs., Inc. v. United*
13              *States*, 136 S. Ct. 1989, 1996 (2016). "The materiality standard
               is *demanding*." *Id.* at 2003. "[W]hen evaluating materiality
14              under the False Claims Act, the Government's decision to
               expressly identify a provision as a condition of payment is
15              relevant, but not automatically dispositive." *Id.* "[I]f the
               Government pays a particular claim in full despite its actual
16              knowledge that certain requirements were violated, that is very
               strong evidence that those requirements are not material." *Id.*

17

18    (Dkt. No. 78 at 12 (emphasis added).)

19         After evaluating Relators' claims under this "demanding" standard, the Court

20    found that "Relators' allegations are insufficient under the *United Health Services*

21    standard of materiality," because: (1) "Relators must do more than simply conclude that

22    the conditions of payment are material"; and (2) "the government knew about the

23    allegations when Relators initiated this action in 2016, but chose not to intervene after

24    conducting a two-year investigation," and "Relators do not allege that the government

25    stopped making payments to TruConnect or sought reimbursement from TruConnect for

26    past payments during or after the two-year investigation."  (Dkt. No. 78 at 12-13.)

27         The same two defects require dismissal of Relators' FCA claims in the TAC for

28    failure to plead *Escobar* materiality.  Although Relators allege "Additional Facts Related

1  to Materiality," they simply cite to the regulations themselves and make conclusory

2  assertions that compliance with the Lifeline regulations is "material to payment." (TAC

3  ¶¶ 166-173). Absent any *factual* allegations establishing materiality, the FCA claims fail

4  as a matter of law. *See Knudsen v. Spring Comms. Co.*, Nos. C13-04476 CRB, C13-4465

5  CRB, C13-4542 CRB, 2016 WL 4548924, at *13 (N.D. Cal. Sept. 1, 2016) (dismissing

6  complaint where relator failed to follow instructions outlined in *Escobar* for demonstrating

7  materiality, and instead "only point[ed] to the regulations").

8       More problematic, Relators still do not allege that the government changed its

9  payment position with respect to TruConnect after being on notice of the conduct alleged

10  in the TAC. Quite the opposite. While Relators assert "[t]he government consistently

11  refuses to pay claims based on noncompliance with the Lifeline usage and eligibility

12  requirements," they do not and cannot dispute the incontrovertible fact that the

13  government has continued to pay TruConnect's Lifeline claims for *over five years* after

14  commencing the 2015 FCC Investigation. Absent such allegations, the alleged

15  misconduct described in TAC *cannot be material* to payment by the government.[12]

16      **B.**   **Nothing in the TAC Cures the Defects this Court Already Found in**
17             **Relators' Retaliation Claim.**

18       To plead a retaliation claim under the FCA, Relators must allege: (1) they engaged

19  in conduct protected by the FCA; (2) TruConnect *knew* they engaged in protected

20  conduct; and (3) TruConnect discriminated against them because of their protected

21  conduct. *Cafasso,* 637 F.3d at 1060. While Relators include certain "Additional

22  Retaliation Facts" (TAC ¶¶ 136-41, 157-65), the TAC still fails to plausibly allege any of

23  these elements.

24

25  [12] The Court granted leave to amend so, "Relators could plead additional facts to show
26  how the California Public Utility Commission's actions [which they raised in opposition
   to TruConnect's prior motion to dismiss] demonstrate materiality." (Dkt. No. 78 at 13.)
27  But the TAC makes no mention of the California Public Utility Commission, much less
   any action it took with respect to Lifeline payments to TruConnect.
28

1    First, Relators' conduct, as alleged, is not protected because the activities they

2    investigated and complained of could not reasonably have led to a viable FCA action.

3    *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996) ("[T]he plaintiff must be

4    investigating matters which are calculated, or reasonably could lead, to a viable FCA

5    action."); *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir.

6    2002) ( "[A]n employee engages in protected activity where (1) the employee in good faith

7    believes, and (2) a reasonable employee in the same or similar circumstances might

8    believe, that the employer is possibly committing fraud against the government.").

9    Without pleading an objectively reasonable FCA violation, there is no protected activity,

10   and thus no claim for retaliation.  *U.S. ex rel. Zemplenyi v. Grp. Health Co-op.*, No. 09-

11   603-RSM, 2012 WL 1642213, *3 (W.D. Wash. May 10, 2012) (no retaliation claim based

12   on employer's alleged scheme to defraud Medicare because relator failed to plead an

13   objectively reasonable FCA violation).

14   Second, even if Relators were engaged in protected conduct (they were not),

15   Relators fail to plead facts sufficient to show that TruConnect ***knew*** they were engaged in

16   protected activity.  The Court previously found that Relators' retaliation claims should be

17   dismissed because, "Relators do not claim to have reported *fraudulent conduct* to Berger

18   [sic]," and "Relators do not establish requisite employer notice."  (Dkt. No. 78 at 13-14

19   (emphasis in the original).)  While the TAC alleges certain further details about Relators'

20   conversations with Burgar, the new claims are still deficient because they do not plausibly

21   allege that Relators told Burgar about any fraudulent conduct they were investigating.

22   While Relators conclusorily allege that they "said that they had concerns about fraudulent

23   billing to the government," (TAC ¶ 159), in the same paragraph, Relators concede that the

24   basis for their concerns was "billing for one-second calls and the unusual usage."  (*Id*.)

25   Leaving aside the fact that Relators fail to allege with particularity that TruConnect

26   actually billed for one-second calls or subscribers with "unusual usage" (whatever that

27   means), Relators do not allege that either practice violates any Lifeline regulations, and

28   indeed, they do not.  Without more, these allegations do not plausibly show that Relators

disclosed to TruConnect they were engaged in protected activities, much less that TruConnect **knew** Relators were engaged in such protected activities.

And third, whatever back-and-forth ensued after Relators raised these purported "concerns" is not probative of TruConnect discriminating against Relators because of any allegedly protected conduct.  More plausibly, Burgar's comments (if true)—that "We work hard for those one-second calls.  What are you trying to allege, Regie?" (TAC ¶ 159), and "Melinda, back off.  I need this job" (*id*. 161)—relate to his annoyance and frustration that Relators were diverting time and energy away from their job functions, neither of which had anything to do with billing the government for Lifeline wireless subscribers.  This is consistent with Relators' allegation that Burgar told Salgado to "mind his own business and focus on inventory and not billing issues."  (*Id*. ¶ 157.)  Indeed, Relators' intrusion and interference into a business function wholly outside their own job functions—which concerned only the purchase and distribution of wireless handsets and SIM cards (*id*. ¶¶ 20-21)—likely would have been grounds to terminate Relators for cause, had they not been terminated due to a company-wide reduction in force.[13]  (*Id*. ¶ 156.)

## C.  Relators' State Law Claims Must Be Dismissed.

### 3.  Relators' California FCA Claims (Counts 3, 4 and 6) Still Fail Under Rule 9(b).

"Rule 9(b)'s particularity requirement applies to state-law causes of action."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  Once again, Relators' state law claims are largely legal conclusions and repeat the federal FCA counts.  (*See, e.g.*,

---

[13]  Relators now allege that TruConnect "posted a position matching Zambrano's responsibilities within about a week of Zambrano's termination."  (TAC ¶ 165.)  But Relators do not allege any **facts** about where it was "posted," how the purported posting "matched" Zambrano's position, that the "posting" was a **job posting** seeking someone to fill Zambrano's prior position (it could have been "posted" anywhere, for any number of reasons), much less that TruConnect actually hired anyone to replace the position, which it did not given the economic causes of its company-wide reduction in force.  This surely isn't "enough to raise a right of relief above the speculative level[.]"  *Twombly*, 550 U.S. at 555.

1  TAC ¶¶ 197-217, 225-231.)  This does not satisfy Rule 9(b), so the claims must be

2  dismissed.

3      **4.**      **Dismissal of Relators' FCA Claims Still Requires Dismissal of All State Law Claims.**

4

5        Because Relators have failed to state viable FCA claims, the Court should decline to

6  exercise supplemental jurisdiction over the pendent state law claims under California's

7  FCA and alleging a California Labor Code violation.  *United Mine Workers v. Gibbs*, 383

8  U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the

9  state claims should be dismissed as well."); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550,

10  561 (9th Cir. 2010) ("In the usual case in which all federal-law claims are eliminated

11  before trial, the balance of factors to be considered under the pendent jurisdiction

12  doctrine—judicial economy, convenience, fairness, and comity—will point toward

13  declining to exercise jurisdiction over the remaining state-law claims.").

14      **D.**      **Leave to Amend Relators' Fourth Pleading Should Be Denied.**

15        More than four years after filing their original complaint—and after receiving leave

16  from the Court to amend their deficient allegations—Relators have filed a ***fourth***

17  complaint that still lacks the particularity required under Rule 9(b), and still fails to meet

18  the plausibility requirement of Rule 8(a).  In almost all instances, Relators have left their

19  original defective allegations intact, and simply added new and irrelevant allegations that

20  come no closer to pleading cognizable FCA violations.  There is no evidence to suggest

21  that Relators could cure the multiple deficiencies in their TAC if given the opportunity to

22  file a fifth pleading, especially given the government's prior knowledge of the alleged

23  misconduct and its unchanged payment position over the ***last five years***.  *Zucco Partners,*

24  *LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).  Thus, the Court should

25  exercise its broad discretion and dismiss Relators' TAC with prejudice.  *Brown v.*

26  *Carrington Mortg. Servs., LLC*, No. 12-6974-PA-MRW, 2013 WL 1196868, *2-4 (C.D.

27  Cal. Mar. 25, 2013) (granting defendant's motion to dismiss fraud claim without leave to

28  amend).

1  **IV.    CONCLUSION**

2          For the reasons explained above, the Court should dismiss with prejudice Relators'

3  TAC pursuant to Rule 12(b)(6), Rule 9(b), and Rule 8.

4  DATED:  February 2, 2021              Benjamin N. Gluck
                                         Paul S. Chan
5                                        Julia B. Cherlow
6                                        Bird, Marella, Boxer, Wolpert, Nessim,
                                         Drooks, Lincenberg & Rhow, P.C.
7

8

9                                        By:  _____/s/ Paul S. Chan_____
10                                                     Paul S. Chan
11                                        Attorneys for Defendants TruConnect
                                         Communications, Inc., Matthew Johnson and
12                                       Nathan Johnson

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28